ARTHUR SMITH, *alias* SMOKY SMITH V. THE STATE.

No. 21084. Delivered May 22, 1940.
Rehearing Granted November 13, 1940.

The opinion states the case.

*L. G. Mathews,* of Floydada, and *W. B. Combest,* of Paducah, for appellant.

*Lloyd W. Davidson,* State's Attorney, of Austin, for the State.

KRUEGER, Judge.

The offense is theft of one head of cattle. The punishment assessed is confinement in the State penitentiary for a term of two years.

The only question presented to this court for review is the sufficiency of the evidence to justify and sustain the conviction.

Levi Futrell, the self-confessed thief and accomplice in the commission of the alleged offense, testified in behalf of the State that on or about the 22nd day of February, 1939, he and appellant went out to the Matador Ranch and there, without the consent of the owners took the animal in question. This testimony of itself is not sufficient, under the law, to sustain the conviction. It must be corroborated by other facts and circumstances. Now, let us look at the testimony of the other witnesses and see if it corroborates the accomplice as to the identity of the animal, the theft thereof and tends to connect appellant therewith.

The testimony introduced by the State, briefly stated, shows that late in the afternoon of February 22, 1939, Randal Tucker, who lived with his parents about one and one-half miles from the highway leading from Paducah to Childress, noticed a car pass his home traveling the road which leads from the highway to the Matador Ranch and the Cee Vee community; that about dark he again noticed the car coming back, going east towards the highway. The car was pulling a trailer in which there was a horse and also a cow or yearling. The witness did not recognize any of the occupants of the car.

The Sheriff of Cottle County testified in substance that a little while before sundown he went out on the Childress Highway and met a car pulling a trailer which contained a horse and a white-face yearling; that appellant was driving the car and Levi Futrell was riding with him; that he turned and followed the car and trailer into town. He saw appellant and Futrell unload the yearling; that he inquired of them where they had gotten it. Futrell told the sheriff that he had purchased the yearling from Comy Thomas at Northfield. The horse in the trailer bore fresh saddle marks on his back. The sheriff then

left and returned in about forty minutes. He saw Futrell and the appellant engaged in feeding the animal in the stock pen. The next morning the sheriff, accompanied by some of the managers of the Matador Ranch, made some investigation and found some tracks of the same size and tread as those of the trailer. However, they were badly worn. About one-half mile of the east end of the Matador Ranch they found where a trailer had been pulled up by the side of the road and stopped. They found some hair of a Hereford calf on the grass. They also noticed some medium sized tracks made by a bare-footed horse. While there they heard a cow bawling. They went through the pasture to locate her. They found her and she was traveling. She would go a little ways, stop and bawl and then go on again. They then went after the calf and brought it to the Matador Ranch. They turned the calf out of the trailer into a herd of some 200 or 300 cattle including the cow. They watched this cow and calf all day to see if it would suck the cow. They rounded up the cow and the calf late in the evening and placed the calf in one stock pen and the cow in another. The witness claimed that the next morning when they turned the calf into the lot with the cow he saw the calf suck the cow. He stated that Mr. Russell, Mr. Ellis, Mr. Riley and Mr. Felts and his son were present at the time.

Mr. J. E. Russell, who was with the sheriff when making the investigation and experiments, testified that he was there the next morning when the cow and calf were left together. The calf did not suck the cow in the pen. It did not suck until after it had been loaded into the trailer with the cow. The only way he could tell that it was a Matador calf was the fact that the cow let it suck the next day after they were put into the trailer; that he had noticed a few times when cattle were rounded up close together that a calf would suck the wrong cow.

Mr. Deaton testified that he was present; that he did not see the calf suck the cow but one time, and that was when the cow and the calf were in the trailer.

Mr. Warren testified that he took the cow and calf and placed them in the feeding lot and kept them the rest of the winter; that he saw the calf suck the cow several times.

Commodore Thomas testified that he did not live out at Northfield; that he had never sold any cattle to Levi Futrell or Smoky Smith; that he had a brother living out at Northfield.

Lloyd Thomas testified that he lived at Northfield in Cottle

County; that he never at any time sold any cattle to Levi Futrell or Smoky Smith; that there were other Thomases living around Northfield.

There was the testimony by several cattle men to the effect that some cows will permit calves other than their own to suck them. There was also testimony given by several witnesses that on the day in question they saw the appellant and Levi Futrell on the highway leading from Paducah to Childress; that they had a trailer hitched to their car which contained a horse and that they saw them purchase a white-face bull calf which was unbranded. They saw a man execute a bill of sale to the animal which was witnessed by one of the parties present. A number of witnesses testified to the appellant's good reputation as a law-abiding citizen.

In order for the State to sustain this conviction it was necessary to establish the theft of the animal. This it sought to do by Levi Futrell, a self-confessed accomplice, but this is not sufficient to justify the conviction, inasmuch as he was an accomplice and had to be corroborated. In our opinion, the corroboration is entirely insufficient to meet the requirements of the law. The State sought to corroborate Futrell by showing that the calf sucked a cow which belonged to the Matador Ranch. However, the testimony shows that the calf was away from the cow that afternoon, all that night and part of the next morning, and when it was turned into the pasture with the cow, it did not suck her and at no time did they see it suck the cow until she was placed in the trailer with the calf. There was much testimony to the effect that at times cows will permit calves other than their own to suck them. Consequently, this testimony is of no probative force in seeking to establish the fact that the calf in question belonged to the Matador people. No one could identify the calf, not even the men in charge of the cattle on the Matador Ranch, as belonging to the Matador people. The calf in question was merely an unbranded white-face male, about ten or twelve months' old, sometimes known as a maverick.

In Volume 41, p. 241, sec. 146 of Tex. Jur., it is said: "The statutory provision (C. C. P. Art. 718) that a conviction cannot be had upon the testimony of an accomplice unless corroborated by other evidence tending to connect the defendant with the offense committed applies in prosecutions for theft. The corpus delicti cannot be established by the uncorroborated testimony of an accomplice. It is also necessary to corroborate the

testimony of an accomplice as to the ownership of the stolen property, the taking and the presence of the defendant when the offense was committed."

In the case of Williams v. State, 82 Tex. Cr. R. 215, this court speaking through Judge Davidson, said: "In a case where the ownership of the animal alleged to be stolen is proved only by the uncorroborated testimony of the accomplice, it is not sufficient on the issue of ownership, and therefore, insufficient to support the conviction." See also Hanson v. State, 27 Tex. Cr. App. 140.

When we eliminate the testimony of the accomplice Futrell, what facts have we left to show the theft? Not any except that the alleged stolen calf sucked a cow belonging to the Matador people after they had been placed in the trailer, and not while it was turned into the herd in the pasture and watched all day. Is this sufficient to show that the animal was stolen from the Matador people? We think not. It occurs to us that a calf still sucking a cow when taken away from its mother in the afternoon and kept away from her until the next day and then returned to its mother would immediately run to her and suck her. That is what the sheriff and his companions expected to see when they brought the calf to the ranch and that is why they watched it, but it failed to do what they evidently expected it would do and what would have been natural for it to do. Consequently, the conduct of the yearling in question has no probative force. See McGoodwin v. State, 134 Tex. Cr. R. 231; Harrison v. State, 117 Tex. Cr. R. 565.

Having reached the conclusion that the accomplice testimony was not sufficiently corroborated, we feel constrained to reverse the judgment of the trial court.

The foregoing opinion of the Commission of Appeals has been examined by the Judges of the Court of Criminal Appeals and approved by the Court.

### ON MOTION FOR REHEARING.

HAWKINS, Presiding Judge.

The State has filed a motion for rehearing insisting that we were in error in concluding that the accomplice witness Levi Futrell was not sufficiently corroborated.

It may be conceded as urged in the State's motion that Futrell's evidence shows:—(1) The identity of the animal in

question as belonging to the Matador Land & Cattle Co., (2) The theft of the animal, and (3) That at the time of the theft Futrell and appellant were both present and acted together in the commission of the theft.

If the other evidence corroborates the testimony of Futrell on the three particular points mentioned and tends to connect appellant with the theft of said animal, the State's motion should be sustained, otherwise it should be overruled.

In determining the sufficiency of the corroborating evidence the same rule should control as is applied in passing upon the sufficiency of the evidence generally to sustain a conviction, that is, regardless of conflicts which are for the jury to settle, the record should be looked to in order to ascertain whether the State's evidence, if accepted as true, meets the provisions of Art. 718 C. C. P. which in this case requires that the non-accomplice evidence shall tend to connect appellant with the theft of a Matador Hereford yearling.

We adopt the summarization of the State's evidence as contained in the State's motion for rehearing, with one or two minor changes only. The statement of facts supports the conclusions found in the condensed statement.

"At about four o'clock on the afternoon of February 22, 1939, the appellant and Levi Futrell were seen together, leaving the town of Paducah driving a Buick coupe, to which was attached a trailer, and in the trailer was a horse. They were driving out of town, going north on the Childress road. (S. F. 48). The road one would have to travel in going from the town of Paducah to the pasture of the Matador Land & Cattle Company is the Childress road going north out of Paducah, this being the same road appellant and Futrell were seen traveling on. To get to the Matador pasture from the Childress highway, one would travel a road which leaves the Childress highway at a point some seven miles north of Paducah and goes west passing the home of Randal Tucker at a point one-half mile before it enters the Matador Ranch, Tucker's house being one and a half miles off the Childress road. (S. F. 8, 2 and 3.) At about five o'clock, the time not being fixed exactly, on the evening of February 22, 1939, Randal Tucker saw a big coupe towing a trailer with a horse in it coming from the direction of the Childress highway and from the direction of Paducah and going towards the Matador Ranch. (S. F. 3). He had seen this same car and trailer go by in the same direction on several other occasions. About an hour or an hour and a half after

seeing the car towing the trailer with the horse in it going towards the Matador Ranch, the witness Tucker (S. F. 3) observed it coming from the direction of the Matador pasture, and at that time there was in the trailer, in addition to the horse, a reddish yearling. The day was still light enough to enable the witness to see, but he did not make a close observation of the yearling.

"On the same evening, a little before sundown, Mr. C. A. Brooks, Sheriff of Cottle County, accompanied by his deputy, Mr. Wiley Ellis (he being the same person who had observed the appellant and Futrell leaving town in the car with the trailer and horse), drove out of Paducah, going north on the Childress road, which was the same road leading to the Matador pasture, and the same road appellant and Futrell had been seen traveling on, and was, also, the same road going by the Randal Tucker place (S. F. 4-5 and 8). At a point about three miles out of Paducah (S. F. 11), Sheriff Brooks and his deputy, Wiley Ellis, met a Buick coupe with a trailer attached, which car was then traveling towards Paducah. The appellant was driving the car, with Levi Futrell riding with him, and in the trailer were a horse and a whitefaced, red bull yearling. The sheriff turned his car, and he and Ellis followed the appellant and Futrell to Paducah and saw these men unload the calf in a corral (S. F. 5, 6 and 13.) They also saw a horse, which appellant claimed, and which had also been in the trailer with the yearling. They observed this horse carefully, and testified that the horse showed signs of having been ridden recently, as it was sweatty and saddle and bridle marked (S. F. 6 and 13.) The horse was barefoot and had similar feet to the tracks later found in the Matador pasture (S. F. 9 and 18.) Appellant claimed the horse as his own (S. F. 6). Sheriff Brooks asked where they got the calf. In appellant's presence, Futrell answered that they got the calf from Comy Thomas at Northfield and stated that they had twenty-five head and were getting them one or two at a time. Appellant was present but said nothing. The sheriff then made inquiry concerning Comy Thomas at Northfield, but could not locate him (S. F. 7 and 8.) The sheriff again went to the corral where appellant and Futrell were with the calf and horse, and said to them, 'Boys, you have got a hot calf and I want to talk to the fellow you got it from.' Appellant said, 'Yes.' (S. F. 7). Appellant and Futrell were arrested later that same night. (S. F. 8.)

"On the following morning Sheriff Brooks, accompanied by Mr. J. E. Russell, went out to the Matador pasture, following

the same road that passed the Tucker place (S. F. 6 and 9) and observed the car tracks, trailer tracks, horse tracks, and other evidentiary signs. They saw car, trailer and horse tracks that corresponded with the tracks of the car, horse and trailer of appellant, the one appellant had been driving the evening before when he had the horse and calf in the trailer (S. F. 9 and 18.) They could tell from evidence on the ground, where the back of the trailer had stopped, and at the same place, found the horse tracks and red hair from a Hereford calf on the ground, and 'looked like where a calf had been lying down.' (S. F. 9, 17 and 18.) Sheriff Brooks and Mr. Russell then heard a cow bawling; they got her located; she was traveling, would go a little way, bawl and then move on (S. F. 10 and 18.) 'This cow was bawling and she was performing like a mother cow would that had lost her calf would perform.' (S. F. 19.) Brooks and Russell kept the cow under observation. Cowhands rounded up some two or three hundred head of cattle and this cow that had been observed bawling was thrown with them but still kept under observation. Deputy Ellis and Mr. Reilly, the manager of the Matador Ranch, and others brought the calf from town to the point where Brooks and Russell were watching the bawling cow. The cow which had been been bawling and which Russell and Brooks had kept under observation showed that she had not been sucked that day prior to the bringing of the calf to the pasture. (S. F. 12, 13, 15 and 18.) In Mr. Russell's significant language, 'This cow was bawling and she was performing like a mother cow that had lost her calf would perform.' After the calf was brought from Paducah to the pasture, it was released near the herd that was being held. It was a very wild calf. (S. F. 10, 18 and 22.) It ran through the herd 'on the prod' and 'Very much on the fight;' after running through the herd and milling around in it, this calf found the cow that had been bawling, and the cow and the calf both got quiet. Mr. Reilly's testimony is, 'She put her nose over on him and went to grazing.' (S. F. 22.) 'The calf stayed around and was very uneasy and was watching the men on horseback, but stood by the cow'. (id.) It did not immediately suck the cow but kept watching the cowboys on horseback. The conduct of this cow and calf before their reunion, at the time of meeting and following the meeting is graphically described by the witnesses Brooks, Russell, Reilly and Felts in the idiom of the rangeland. The cow was abundantly identified as a Matador owned cow. (S. F. 16, 19, 23 and 25.) The calf followed the cow. The cattle were allowed to break up, that is, the herd was allowed to separate; and this cow that had been bawling, now quiet, with

the wild calf that had been brought out from Paducah and that came out of the trailer that the appellant had been towing behind the car he was driving, and which he had unloaded at the corral in Paducah, also now quiet, following her, left the herd. The calf had not been seen to suck the cow. The cow and calf went into a rough canyon, out of the sight of the observers for a short time. They were brought out of the canyon by Slim Felts, and at that time the cow's bag showed evidence of having been sucked, the hair around it was wet (S. F. 11, 13, 19 and 23); and the calf appeared 'contented', and he and the cow were 'satisfied together' and 'she didn't do any more bawling' (S. F. 19-20). In the language of Slim Felts, who had brought the cow and calf out of the canyon, 'The cow laid down and the calf stood around a little bit and came around and laid down pretty close to where the cow was . . . . . . The Matadors owned that cow and she was one of the cows under my particular charge . . . I saw that this cow and calf was mated up and there wasn't any use of going any further, and I turned around and taken them back and put them in the corral and kept them over night. The cow taken that calf and claimed it, and I claim it for the Matadors.' (S. F. 25.) 'I saw it suck after he loaded them in the trailer . . . . The only way I have of telling that was a Matador calf is the fact that this cow let it suck the next day after we put them in the trailer, and the way they met up the day they brought it out there . . . . I couldn't swear it was a Matador calf until I saw it mate up and saw it suck the cow.' (S. F. 26.)

"After the cow and calf were brought out of the canyon, and after the cow appeared to have been freshly sucked and the calf contented, they were put in separate pens and so kept the night of February 23, 1939. The next morning the calf was turned in with the cow. Sheriff Brooks and Wiley Ellis testified that it sucked immediately. (S. F. 12, 15 and 16.) The other witnesses did not see the calf suck before it was put in the trailer with the cow, but all observers saw it suck the cow in the trailer. The calf continued to suck this cow for some time while in the feed pens at Russellville camp, to which place they were taken and kept under observation."

In describing the animal in the trailer with the horse when the parties returned from the direction of the Matador pasture the witness Tucker said "There was a horse and a yearling in the trailer. I mean by yearling a cow brute." Mr. J. E. Russell, Inspector for the Cattle Raisers Association testified not only to facts observed by him, but also qualified as an expert. His evi-

dence, in part, is quoted: "From my experience and observation of cattle, an animal that is raised in a large pasture would naturally be wilder than one that is raised in a small pasture. The calf that I saw up here in the pen was the same calf that I saw unloaded from the trailer in the Matador pasture, and it sure was a wild calf. Ordinarily a wild cow will not mother any other calf than its own; they will never do it after they are the size of this calf. This calf would weigh 500 pounds, I guess; it was a big calf. From my observation of cattle, I don't think any other cow except its own mother would have allowed that calf to suck."

Attention is called particularly to the following circumstances: (a) Late in the afternoon of February 22d appellant and Futrell were seen leaving Paducah in a Buick coupe towing a trailer in which was appellant's horse. They were going in the direction of the Matador pasture. (b) When the car—"a big coupe" passed the Tucker place going toward the Matador pasture, it was towing a trailer in which was a horse. When the car returned from the direction of the Matador pasture there were in the trailer a horse and a "reddish" yearling. (c) Before any arrest was made, and when the sheriff first questioned the possession of the yearling by appellant and Futrell the latter in the presence of appellant made the explanation that the animal had been purchased from Comy Thomas. Upon the trial this explanation was admitted by Futrell to have been false, after the State had proved by Commodore Thomas (known as Comy Thomas) that the explanation was untrue. (d) The time that appellant and Futrell were seen leaving Paducah corresponds in time and description of the outfit with the one seen passing Tucker's place going toward the Matador pasture. The time the parties were seen returning to the Tucker place is not inconsistent with the story told by Futrell as to what happened, and the description of the outfit seen returning fits exactly with that which appellant and Futrell were using. The time elapsing between the observation of the car and trailer as it returned by the Tucker place corresponds with the time when the sheriff met appellant and Futrell returning to Paducah. (e) Appellant's horse which was in the trailer with the yearling was barefoot, and in a general way made the same character of tracks found in the pasture near the car and trailer tracks, which also correspond in a general way with the tracks of the car and trailer in use by appellant and Futrell. All of these items appear to be proven circumstances which to our mind tend to connect appellant with the theft of a Matador yearling.

All the evidence established the fact that the calf or yearling in question was ten or twelve months old, had horns about six inches long, weighed about five hundred pounds, was a big calf, had been raised on a range in a large pasture and was very wild.

Mr. Woodfin Woodley, qualified as an expert on the habits of cattle and testified for appellant. His evidence on cross-examination seems rather favorable to the State. It follows: "If the calf was ten or twelve months old, an ordinary range cow would be nearly dry, and if she was bawling around and hunting her calf and didn't have much milk, and a ten or twelve months old calf was turned out, I don't think she would mother that calf and let it suck her. I never saw that happen with a calf that old. My experience has been with gentle cows and cow-pen cows and smaller calves, up to a month old. There would be a difference in mothering a calf that age and a bull calf ten or twelve months old."

Mr. George P. Humphreys, also an expert defense witness, was manager of the Burnett "6666" Ranch. His testimony on cross-examination, in part, is quoted: "If a ten or twelve months' old calf with horns six inches long was taken out to a ranch and I found a Hereford cow that was nearly dry and bawling around and turned this calf out and this cow mothered it up and let it suck, and they got off together and grazed together, I would think that was her calf; I would think mighty strong it was. If the calf was a ten or twelve months' old bull calf, with horns six inches long, and the cow had the year mark of 1928 and was in poor condition and nearly dry and had lost her calf, and this was a strange calf and she had never seen it before, and it turned out and she mothered that calf up and let it suck her, I would think it would be her calf in that case. If it wasn't her calf, I don't think she would let him suck."

We may have written at unnecessary length on the motion for rehearing, but having concluded that we reached the wrong result originally, it has been our desire to set out in some detail the reasons for changing our view.

We have thought it not called for to set out the defense or conflicting evidence. All issues raised thereby were submitted to the jury, and their finding is binding on this court.

The motion for rehearing is granted, the judgment of reversal is set aside and the judgment of the trial court is now affirmed.